# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ROGER W. ALSWAGER,

        Plaintiff,

v.                                                                           Case No. 09-C-52

ROCKY MOUNTAIN INSTRUMENTAL
LABORATORIES, INC., and ROBERT K. LANTZ,
individually and as agent of RML,

        Defendants.

# ORDER

The plaintiff, Roger W. Alswager, a state prisoner, is proceeding *pro se* in this case against defendants Robert K. Lantz and Rocky Mountain Instrumental Laboratories, Inc. ("Rocky Mountain"). This court has diversity jurisdiction over this case. 28 U.S.C. § 1332. Now before the court is the defendants' motion for summary judgment and the plaintiff's motion for extension of time. As an initial matter, the court will not treat the Affidavit of Robert K. Lantz, Ph.D. as an expert opinion regarding the plaintiff's involuntary intoxication defense. Thus, the plaintiff's motion for an extension of time to retain a competing expert will be denied because it is unnecessary in the context of today's ruling.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, — F.3d —, 2011 WL 31855, at *3 (7th Cir. Jan. 6, 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

**FACTUAL BACKGROUND**

The parties present entirely different views of what constituted the contract for services, as well as the terms of the parties' arrangement. There is not one written agreement that governs the relationship. Rather, it may be best described as a confluence of e-mail messages and telephone conversations. As the Seventh

Circuit noted in *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009), a person comparing the plaintiff's version of events with that of the defendants "would be forgiven for thinking that each was recalling an entirely different event."

> The standard of review governing summary judgment, however, resolves at least one question: we must accept all facts and reasonable inferences in the light most favorable to the non-moving party – here, the plaintiffs. We do not judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact.

*Id.* Accordingly, the court will present and consider the facts in the light most favorable to the plaintiff.

The plaintiff was, at all times material, a defendant in a criminal case, charged with operating a motor vehicle while intoxicated. He intended to pursue an involuntary intoxication defense and argue that he inadvertently took one of his wife's Ambien pills, which led him to consume alcohol and drive without realizing he had consumed the alcohol.

According to the plaintiff, his criminal defense attorney, Lisa C. Goldman, began e-mail correspondence with defendant Dr. Robert Lantz in August 2007, and the topics of their communications included Dr. Lantz's fees for testing a blood sample for the presence of Ambien, turnaround time, minimum cutoff levels using different technologies, and methods of preserving the blood sample.

On January 14, 2008, Goldman and Dr. Lantz had a twenty minute long telephone conversation. Goldman's notes from the conversation reflect that Dr.

-3-

Lantz told her that Ambien is strongly associated with anesthetics and that dissociative behavior is a generally well recognized side effect. Dr. Lantz advised Goldman that there was no specific dosage or concentration required to trigger the dissociative response and that there were numerous reports of people eating all kinds of food in the kitchen with no memory thereof after taking Ambien. He also told Goldman that the dissociative effects could occur 1-2 hours after taking the Ambien.

During the conversation, Goldman explained the planned involuntary intoxication defense to Dr. Lantz. Dr. Lantz told Goldman that there would be a short turnaround time on a test for Ambien, and Goldman told Dr. Lantz that she wanted a test result as soon as possible. Dr. Lantz advised Goldman that his fees for expert witness testimony were $300 per hour with a daily cap of $2,500, plus expenses. Goldman informed Dr. Lantz that the trial was scheduled to begin on February 19, 2008, but could go for two days; Dr. Lantz told Goldman he was available to testify those days and agreed to testify at the trial.

Goldman and Dr. Lantz spoke again on January 16, 2008, and Dr. Lantz assured Goldman that there was no problem to getting started and that the test for Ambien would be completed within two weeks. Dr. Lantz also told Goldman about the type of testing the lab would use and some details regarding potential results. He indicated that Rocky Mountain was primarily a pharmaceutical lab that performed testing for drug companies, which warranted their investment in the latest technology. He described the superiority of Rocky Mountain's equipment and even

sent Goldman a power point presentation he had made recently at an industry convention or seminar.

On January 18, 2008, Goldman advised Dr. Lantz that the plaintiff had consented to having Rocky Mountain test his blood sample for the presence of Ambien. She entrusted Dr. Lantz with the task of having the plaintiff's blood sample transferred from another lab and provided him with her firm's FedEx account number to facilitate billing. Dr. Lantz again advised Goldman that the testing should be complete in two weeks. Goldman asked Dr. Lantz to have the blood sample transferred overnight, but the transfer was not accomplished until January 24, 2008. Additionally, the defendants did not order the materials needed for the Ambien test until January 29, 2008, and Dr. Lantz did not complete the four hour test for Ambien until at least February 18, 2008. The defendants finished testing the plaintiffs blood for alcohol on or before February 4, 2008, but offered no explanation for not testing for Ambien at the same time.

Goldman contacted Dr. Lantz on February 7, 2008, two weeks after their January 18th call. Dr. Lantz told Goldman that he had developed the assay but did not expect to run the actual test on the plaintiff's blood until the following week. When Goldman sent an e-mail message to Dr. Lantz on February 11, 2008, he confirmed that they would be doing the Ambien test that week.

On February 13, 2008, in an exchange of e-mail messages, Goldman asked Lantz, "Would you be available to testify, if needed, on Tuesday, February 19, 2008, in Waukesha, Wisconsin?" (Affidavit of Roger W. Alswager, Exhibit 21). Dr. Lantz

promptly replied, "I am tied up on that day and I do not think that the other trial will go away." *Id.* Dr. Lantz had agreed to appear at a hearing that day in Grand Junction, Colorado. However, his plans changed and he did not attend the hearing. Dr. Lantz did not inform Goldman of his availability. The plaintiff presents evidence that this was a hearing, not a trial, that Dr. Lantz did not end up attending the hearing, and that he had agreed to attend this hearing on January 22, 2008, eight days after he told Goldman he would appear at the plaintiff's trial.

Assistant District Attorney Timothy Suha called the defendants on February 14, 2008. He inquired about the status of the testing to determine whether the State would need to present expert witness testimony to rebut a claim related to the presence of Ambien in the plaintiff's blood sample.

On February 17, 2008, a Rocky Mountain employee worked up the standards for the Ambien testing and prepared the control samples. Dr. Lantz completed the test of the plaintiff's blood sample for Ambien late in the afternoon on February 18, 2008, the day before the plaintiff's trial.

Also, on February 18, 2008, Goldman attempted to obtain a continuance of the plaintiff's criminal trial because they did not have the results of the Ambien test and Dr. Lantz was not available to testify. Dr. Lantz accepted a trial subpoena from Goldman and provided curriculum vitae and an affidavit regarding his inability to appear at the trial. The plaintiff's motion to adjourn his criminal trial failed, and the trial began on February 19, 2008. There was no evidence introduced regarding Ambien in the plaintiff's blood sample. He was convicted on February 20, 2008.

On February 20, 2008, Dr. Lantz sent an e-mail message to Goldman with the informal results of the Ambien test. Dr. Lantz and Goldman continued to correspond and talk on the telephone regarding Dr. Lantz's findings, the involuntary intoxication defense in Wisconsin, and Dr. Lantz's availability as an expert witness. Dr. Lantz cooperated with Goldman while she prepared a motion for a new trial and an interlocutory appeal regarding the denial of the motion to adjourn the trial. She indicated that she wanted to retain Dr. Lantz as an expert witness for the new trial, if they were successful in getting one.

**DISCUSSION**

The defendants submit that they are entitled to summary judgment on the plaintiff's negligence, negligent and intentional misrepresentation, breach of fiduciary duty, and breach of contract claims. They contend that: (1) the plaintiff's tort claims are barred by Wisconsin's actual innocence rule; (2) the plaintiff is unable to prove any elements of a negligence claim; (3) the plaintiff cannot substantiate his claims for negligent and intentional misrepresentation; (4) there is no fiduciary relationship between the parties and the material facts do not support a breach; and (5) there is no breach of contract, as a matter of law.

In response, the plaintiff argues that proof of actual innocence is not required for recovery of damages on any of his claims and that disputes of material facts preclude summary judgment. He also responds to the defendants' arguments regarding each of his claims.

## I. ACTUAL INNOCENCE

The defendants urge this court to exclude the plaintiff's tort claims based on Wisconsin law requiring a showing of actual innocence before a criminal defendant can pursue a legal malpractice claim against his defense attorney. *See Hicks v. Nunnery*, 2002 WI App 87, 253 Wis.2d 721, 643 N.W.2d 809; *Tallmadge v. Boyle*, 2007 WI App 47, 300 Wis.2d 510, 730 N.W.2d 173. However, these cases and the six public policy considerations underlying the imposition of the actual innocence rule are in the exclusive context of *malpractice* claims against lawyers, as opposed to claims made against vendors used by criminal defendants. To apply the actual innocence rule to this case, where the plaintiff is pursuing tort claims against a lab and an expert witness retained as part of the plaintiff's criminal defense, would be a considerable extension of the rule created by the Wisconsin courts. It is not the role of this court to create new Wisconsin common law, but rather to predict how the Wisconsin Supreme Court would decide the matter if it were "presented presently" to that tribunal. *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 635 (7th Cir. 2002). This is the type of question that the Seventh Circuit Court of Appeals might well certify to the Wisconsin Supreme Court. However, Wisconsin law implicitly prohibits the Wisconsin Supreme Court from answering questions certified by federal district courts, *see* Wis. Stat. § 821.01, and, as such, this court will discuss the efficacy of the tort claims without regard to the actual innocence rule.

## II. BREACH OF CONTRACT

The defendants argue that the undisputed facts demonstrate that Rocky Mountain fully complied with the parties' contract and that Dr. Lantz was not a party to that contract. They further argue that there was no contract for expert testimony at trial. Finally, the defendants submit that, as a matter of law, the plaintiff cannot recover the damages he claims for breach of contract.

In response, the plaintiff argues that the defendants breached the contract by failing to timely complete testing, failing to call Goldman or otherwise provide the test results prior to trial, disclosing the results of the alcohol testing and the status of the Ambien testing to an adverse party without authorization, and issuing a false report regarding their tests. The plaintiff also contends that an implied in fact contract should be found between the plaintiff and Dr. Lantz because his retention as an expert witness can be inferred from the conduct of Goldman and Dr. Lantz.

It is difficult to identify the terms of the contract between the parties. There is no single written instrument that sets forth all of the terms under which the defendants agreed to provide services to the plaintiff.

Viewed in the light most favorable to the plaintiff, defendant Rocky Mountain contracted to test the plaintiff's blood sample for alcohol and Ambien within two weeks of officially being retained on January 18, 2008. The tests were not completed within two weeks and, therefore, a jury could conclude that the Rocky Mountain breached its contract with the plaintiff.

Despite defendant Dr. Robert Lantz's argument that he was never retained by the plaintiff as an expert witness, either individually or through Rocky Mountain, the conduct of the parties belies this assertion. Dr. Lantz provided Goldman with his expert witness fee rates, Goldman told Dr. Lantz the trial dates, and he agreed to appear. A reasonable jury could conclude that Dr. Lantz agreed to testify at the plaintiff's criminal trial in January 2008, or a reasonable jury could conclude from Dr. Lantz's communications with Goldman in February 2008, his acceptance of the trial subpoena, and his subsequent affidavits, that Dr. Lantz had agreed to testify at the plaintiff's criminal trial as an expert witness.

Neither defendant is entitled to summary judgment on the plaintiff's breach of contract claim. The plaintiff's damages at trial will be limited to those legally allowed for breach of contract. However, it will be up to the defendants to argue that the plaintiff is not entitled on the merits to certain damages and/or that the damages the plaintiff claims do not arise naturally from a breach of contract.

### III. NEGLIGENCE

To succeed on a negligence claim under Wisconsin law, "there must exist: (1) a duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury." *Coffey v. City of Milwaukee*, 74 Wis.2d 526, 531, 247 N.W.2d 132 (1976). The defendants contend the plaintiff cannot prove any elements of a negligence claim.

The plaintiff relies on *Colton v. Foulkes*, 259 Wis. 142, 146, 47 N.W.2d 901 (1951), to argue that tort liability can derive from negligent performance (or non-performance) of contract obligations or agreements.

> In *Colton*, [the Supreme Court of Wisconsin] allowed an action in tort against a defendant who allegedly negligently repaired the plaintiff's porch. The defendant contended that since his employer had contracted with the plaintiff to repair the porch, the cause of action was a breach of contract and no tort action could be maintained. In discussing our reasoning, in allowing the action to proceed in tort, we concluded that there was a general duty of due care in repairing the porch to avoid personal injury, and thus the contract merely "create[d] the state of things which furnish[ed] the occasion of the tort." *Colton*, 259 Wis. at 146, 47 N.W. 2d 901. Quoting 38 Am.Jur. *Negligence*, p. 661, sec. 20, we also stated that "[a]ccompanying every contract is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done . . . ." *Id.*
>
> However, we later explained the limits of *Colton* in *Landwehr*, 110 Wis.2d 716, 329 N.W.2d 411. In *Landwehr*, we explained that our language in *Colton* was meant to indicate that the "'state of things' which arises out of a contract furnishes the occasion for the tort, but not the underlying duty for the tort." *Landwehr*, 110 Wis.2d at 723, 329 N.W.2d 411. We concluded that "there must be a duty existing independently of the performance of the contract for a cause of action in tort to exist." *Id.* We reaffirm that holding today. We also note that *Brooks*, 133 Wis. 2d 228, 395 N.W.2d 167, although decided after *Landwehr*, merely quoted the language from *Colton* and did not change the interpretation of that language provided in *Landwehr*.

*Greenburg v. Stewart Title Guaranty Co.*, 171 Wis. 2d 485, 495-96, 492 N.W.2d 147 (1992). In *Greenburg*, the court went on to "hold that a title insurance company and/or its agent is not liable in negligence for an alleged defect in title when it issues

a title insurance policy unless it has voluntarily assumed a duty to conduct a reasonable search in addition to the mere contract to insure title." *Id.* at 496.

In this case, the plaintiff argues that the "[d]efendants did not comply with their end of the bargain." (Plaintiff's Response Brief, p. 27). He considers their failure to comply with the terms of the contract to be a breach of a duty towards him. As in *Greenburg*, the defendants here are not liable in negligence for their failure to timely test the plaintiff's blood sample for Ambien or for Dr. Lantz's failure to appear at the plaintiff's trial as an expert witness because they did voluntarily assume a duty outside of the contract.

The plaintiff asserts that a lab who tests his blood has a duty of care to him and cites cases in which courts have found that a laboratory owed a duty of care to persons whose blood they tested, even when retained by third parties. However, the plaintiff acknowledges that these cases are not precedent and that there is no case on point in Wisconsin. Once again, this court will not extend Wisconsin state law in a diversity action. Based on Wisconsin law, as set forth in *Colton*, *Greenburg*, and *Landwehr*, the defendants have shown that they did not owe the plaintiff a duty outside of the contract between the parties, and the court will grant the defendants' motion for summary judgment with regard to this claim.

IV. **MISREPRESENTATION**

The defendants maintain that the plaintiff cannot substantiate his misrepresentation claims. The plaintiff again argues that the defendants owed him a duty of care as professionals testing his blood. He also cites to a number of

alleged misrepresentations by Dr. Lantz, including that Rocky Mountain had the standard and assay in place to test for Ambien (when they had yet to purchase the materials) and later that he had another trial scheduled for the day of the plaintiff's trial, as well as his representations in his February 18, 2008 affidavit submitted to the court that he had a long standing prior commitment, and that the testing for Ambien was not yet complete. The plaintiff asserts that Dr. Lantz misrepresented that he had begun the test because he did not provide the results of the four hour test to Goldman until two days later, on February 20, 2008.

Claims of negligent misrepresentation and intentional misrepresentation share the following elements: "1) the defendant must have made a representation of fact to the plaintiff; 2) the representation of fact must be false; and 3) the plaintiff must have believed and relied on the misrepresentation to his detriment or damage." *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 13, 270 Wis.2d 146, 677 N.W.2d 233. To prevail on an intentional misrepresentation claim, also called fraud or fraudulent misrepresentation, the plaintiff must also prove the following additional elements: "4) the defendant must have made the misrepresentation with knowledge that it was false or recklessly without caring whether it was true or false, and 5) the defendant must have made the misrepresentation with intent to deceive and to induce the plaintiff to act on it to his detriment or damage." *Id.*

However, it is "well-established that a nondisclosure is not actionable as a misrepresentation tort unless there is a duty to disclose." *Id.* ¶ 12. For the reasons stated earlier in this opinion, any duty that the defendants had to the plaintiff was a

product of their contractual relationship and was not extrinsic to that contract. As a result, the plaintiff's misrepresentation claim fails for the same reasons his negligence claim failed. The defendants' motion for summary judgment will be granted with regard to the plaintiff's claims for negligent and intentional misrepresentation.

**V.     BREACH OF FIDUCIARY DUTY**

The defendants submit that they are entitled to summary judgment on the plaintiff's breach of fiduciary claim because there is no fiduciary relationship between the parties and because the material facts cannot support a breach.

"Generally, there are two types of fiduciary relationships: (1) those specifically created by contract or formal legal relationship such as principal and agent, attorney and client, trust and trustee, guardian and ward; and (2) those implied in law due to the factual situation surrounding the transactions and relationships of the parties to each other and to the questioned transactions." *Production Credit Ass'n of Lancaster v. Croft*, 143 Wis.2d 746, 752, 423 N.W.2d 544 (Ct.App.1988).

> Manifest in the existence of a fiduciary relationship is that there exists an inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of facts involved, or other conditions giving to one an advantage over the other.

*Id.* at 755-56.

The plaintiff attempts to distinguish this case from *Croft* by arguing that the plaintiff sought professional and expert advice and testimony from the defendants in their field of expertise, forensic toxicology. However, the ways in which the

-14-

plaintiff asserts that the defendants breached their duty do not relate to the field of forensic toxicology.  Rather, they relate to the timely performance of the obligations of the contract.  Moreover, there is no inequality in the relationship between the parties in this case who entered into a contract as part of an arms-length business transaction. There is nothing special about the retention of the defendants that gives rise to a fiduciary duty to the plaintiff.  As the plaintiff has acknowledged, Wisconsin has not recognized that labs have a duty toward those whose blood is tested, let alone a fiduciary duty.  The defendants are entitled to summary judgment on this claim.

Accordingly,

**IT IS ORDERED** that the defendants' motion for summary judgment (Docket #130) be and the same is hereby **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for extension of time (Docket #145) be and the same is hereby **DENIED**.

**IT IS FURTHER ORDERED** that the court will conduct a scheduling conference in this matter on **Thursday, April 14, 2011, at 8:30 A.M.**  In order that this case move forward in a timely manner, the parties should submit a proposed Rule 26 plan consistent with the court's desire to conclude this case by **September 30, 2011**, including trial, if necessary.  Appearances may be made by telephone; however, neither cell phones nor calls made over a speaker phone may be used, as both technologies are incompatible with the court's sound/teleconferencing equipment.  The court will initiate the call.  Therefore, if appearing by telephone the

court must be notified, in advance, of the direct number at which they may be reached.

Dated at Milwaukee, Wisconsin, this 24th day of March, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge